JAMES M. HAGAR, in equity, *vs.* PARKER M. WHITMORE, and others, and

PARKER M. WHITMORE, in equity (cross-bill), *vs.* JAMES M. HAGAR.

Sagadahoc.    Opinion January 4, 1890.

*Equity. Practice. Trust. Sale of securities. Accounting by trustees and compensation. R. S., c. 77, §§ 10-37.*

R. S., c. 77, § 23, providing for reporting equity cases directly to the law court, without any decree by the court in the county, was intended for cases depending mainly for determination on some important or doubtful question of law, the decision of which will practically decide the case.

It is not good practice to report to the law court for original consideration, without the aid of a master's report or justice's opinion, a case in equity where it becomes necessary to sort out and decide many questions of fact, as well as some of law, and to finally adjust and compose all the disputes growing out of numerous and varied commercial and maritime transactions and in which the testimony, including a mass of correspondence, accounts and vouchers, protests, general average statements and many other documents, consists of many hundred pages.

The maxim, *probata secundum allegata,* applies in equity as well as at law. Where the evidence first discloses fresh grounds for relief, or defense, the party desiring to avail himself of them, should state them in some amendment or supplemental pleading.

An accommodation indorsement of another's note is a sufficient consideration to pay therefor, if such promise is in fact made; but the mere indorsement of a friend's note, at his request, does not raise a presumption of such a promise.

A court of equity may retain a bill against a trustee praying for an account, etc., in order to effectuate an accounting and adjustment between the parties, including matters subsequent to the filing of the bill, although the plaintiff has failed to establish the allegations in his bill.

Of the accountability of trustees and their compensation.

On Report.

Bill in equity, with cross-bill, reported to the law court for hearing on bill, answers and testimony. The prayer of the bill was for an acounting by the defendants as trustees of the plaintiff;—a decree to pay over all balances;—and for damages for their alleged mismanagement of the trust property.

The case is fully stated in the opinion.

*W. F. Lunt and J. W. Spaulding,* for plaintiff.

Conduct and liabilities of trustees: 2 Pom. Eq. §§ 1060, 1062, note 2, 1063, 1066-1069; Perry Trusts, §§ 602, 770; 1 Flint's Lewin on Trusts, 252, 258, 422, note, 424, 435; *Oliver* v. *Court,* 8 Price, 165; *Campbell* v. *Walker,* 5 Ves. 680; *Conolly* v. *Parsons,* 3 Ves. 628, note; Sug. Vend. & Pur., 11th ed. 50; *Berger* v. *Duff,* 4 Johns. Ch. 368; *Hardwick* v. *Mynd,* 1 Anst. 109; *Ex-parte, Belchier,* Amb. 218; *Re, Speight,* 22 Ch. D. 727; *Ord* v. *Noel,* 5 Mad. 438; *Rossiter* v. *Trafalgar L. Assur. Asso.,* 27 Beav. 377; *In re, Chertsey Market,* 6 Price, 285.

Care and diligence required: 2 Pom. Eq. §§ 1066, 1067, 1070, 1079–1082; 1 Flint's Lewin on Trusts, 256, 293, 295, 296, 339, 435, 485; 2 Perry's Trusts, § 900; *Fox* v. *Mackreth,* 2 B. C. C. 400; *Hall* v. *Hallet,* 1 Cox, 134; *Whichcote* v. *Lawrence,* 3 Ves. 740; *Ex-parte, Reynolds,* 5 Ves. 707; *Randall* v. *Errington,* 10 Ves. 423; *Sinclair* v. *Jackson,* 8 Cow. 582; *Cranston* v. *Crane,* 97 Mass. 459; *Hawley* v. *James,* 5 Paige, 487; *Cocke* v. *Minor,* 25 Gratt. 246.

*W. L. Putnam and C. W. Larrabee,* for defendant Whitmore.

*F. J. Buker and Weston Thompson,* submitted brief for defendants Theobald and Libby.

Emery, J. This is an equity cause growing out of numerous and varied commercial and maritime transactions, and in which all the testimony including a mass of correspondence, accounts, and vouchers for many years, also protests, general average statements, and other marine documents, together with numberless notes, bills, etc., has been reported to the law court in a voluminous record of over nine hundred printed pages, for original

consideration. From this heterogeneous bulk, the law court is asked, without the aid of any master's report or justice's opinion, to sort out, and decide many questions of fact, as well as some of law, and to finally adjust and compose all the disputes.

We think it would have saved the parties time and expense, had the cause been heard, in the first instance by a master or a single justice, who could have guided the hearing, asked for explanations, made suggestions, eliminated the immaterial, indicated the governing facts, and thus brought the parties to fewer and more precise issues. Amendments could then have been seasonably made to the pleadings, to embrace new claims or defenses disclosed by the evidence. We think, too, such a hearing in the first instance was required by the spirit of the statute. The Equity Procedure Act of 1881, (now R. S., c. 77, §§ 10 to 37 inclusive) intended the equity court to be held by a single justice, with power to hear and determine causes, and make final decrees, substantially as by a chancellor. An appellate court was provided for in the law court, which was authorized to entertain exceptions and appeals. The provision in § 23 for reporting an equity cause directly to the law court without any decree by the court in the county, was intended for cases depending for determination mainly on some important or doubtful question of law, the decision of which would practically decide the case.

The examination and consideration of so much testimony and so many documents have, of course, consumed much time and proportionately delayed the parties ; and we regret that after so much time and labor expended, we find it impracticable, not to say impossible, to finally end the cause or to do more than to indicate the principles by which a master, or single justice is to be guided, and order the cause sent to a master, and remit the cause to the court in the county, to await the master's report. We regret the delay and expense to the parties, and wish they had not made it necessary, by their request and agreement to report the case in bulk, before anything had been determined in the county. In spite of the length of the record we shall state our conclusions with brevity. We have repeatedly declared that upon questions of fact, the law court cannot undertake to do more than state its

findings. To give reasons for findings of fact would encumber the law reports, without aiding the exposition of the law.

The case is briefly as follows:—James M. Hagar being indebted to several Bath, Augusta and Richmond banks, on some of which indebtedness Parker M. Whitmore was indorser for him, and also having had many business transactions with Whitmore, conveyed January 6, 1885, two ships, the Hagarstown and Yorktown by absolute bills of sale to said Whitmore, and Theobald and Libby, the three respondents, and took back from them a writing of the same date signed by them all. The substance of this writing was, that the said Whitmore, Theobald and Libby accepted the conveyance of the ships, to secure the payment of Hagar's indebtedness to the various banks named,—that they were not to be responsible for any debts or damages occasioned by the ships,— that Hagar was to continue to manage them, paying all bills, keeping in good repair, and keeping insured at his own expense in sums not less than $50,000;—that if Hagar should pay or otherwise secure his said debts to the banks, save Whitmore harmless as his indorser or security, pay Whitmore whatever he might owe him, all at or within eighteen months from the date of the writing, and in the meantime do all the things named in the writing for him to do, and save his said trustees harmless, they would thereupon reconvey the ships to him,—but that on Hagar's failure to do as above stated within the eighteen months, then the vendees, or trustees, were to take the property and sell the same without further notice, and from the proceeds pay the debts and liabilities named, and the surplus, if any, to Hagar.

Each of these three vendees was a director in one or more of the banks named.

Hagar did not pay the indebtedness within the eighteen months, nor perform the other conditions named in the writing; and at the end of the eighteen months, July 7, 1886, Whitmore, Theobald and Libby gave Hagar the usual statute notice for the foreclosure of mortgages of personal property, that by reason of his default they claimed a foreclosure of any right of his to manage or redeem the ships. At this time the ships were absent under masters appointed by Hagar and accounting to Hagar. The

trustees notified the masters to account and make remittances to them. About April 25, 1887, the trustees sold the Hagarstown at Shanghai, China, the ship having been much damaged by a cyclone on a voyage thither. June 27, 1887, the trustees conveyed the Yorktown back to Hagar to enable him to carry out a bargain to sell to other parties, he paying the proceeds into the banks on his indebtedness. Disputes arose between Hagar and Whitmore over these matters, culminating in this litigation.

Hagar brought his bill in equity July 25, 1887, against Whitmore, Theobald and Libby reciting the writing of January 6, 1885, and basing his claim thereon, and then alleging, *that* the respondents took possession of the ships, and received large sums of money from their earnings and sale,—*that* although he had performed all the conditions imposed upon him by the writing, the respondents would not pay him the proceeds of the ships, nor account to him as trustees, and finally; *that* they had conducted negligently and wastefully in selling the Hagarstown, in China, instead of repairing her sufficiently to return to the United States, and had thereby occasioned him heavy and unnecessary loss. These are the only allegations. The bill then prays that the respondents be required, 1st, to render a full account; 2d, to pay over all balances; 3d, to pay such damages as their mismanagement occasioned him.

The answers admit the written agreement of January 6, 1885, and admit the taking possession of the ships, but deny the other allegations in the bill. The answers of Theobald and Libby admit that the debts due the banks have been paid, and that, not counting anything due Whitmore from Hagar, there is an apparent balance due Hagar from the funds received by the trustees. Whitmore's answer alleges further, that Hagar is still indebted to him, that many accounts of the ship are still unsettled; that Hagar has prevented their settlement by requesting insurance companies not to pay insurance, by summoning Whitmore as trustee in suits against parties having bills against the ships; and by resisting the payment of taxes on the ships,—that thereby it was not possible to state the account more fully, and not safe to pay over any moneys, while taxes, claims, and debts remained

unsettled; and claims to retain large sums as compensation for the services of the trustees.

Whitmore brought a cross-bill against Hagar reciting the preceding facts and alleging that he has claims against Hagar (1) for numerous indorsements, notes, etc., (2) for personal services as treasurer of the U. S. Manufacturing Co. at Hagar's request, and (3) for personal services on a trip to New Orleans with Hagar on Hagar's business;—and further alleging that Hagar was trying to induce certain insurance companies to refuse payment to the trustees of insurance due them on the Hagarstown. The bill prays that Whitmore's said claims be ascertained, and the amount made a charge upon the money in the hands of the trustees, if any, and that Hagar be enjoined from interfering with the insurance. Hagar's answer denies all indebtedness to Whitmore, and alleges that Whitmore's financial conduct made him apprehensive that money, paid him by insurance companies, could not be recovered from him.

As to Whitmore's claims for the services alleged, we do not find from the evidence any express promise on Hagar's part to pay for them, nor that they were rendered under such circumstances as would imply a promise. Hagar and Whitmore were friends of long standing. Each indorsed notes, and signed bonds for the other for many years. Whitmore, however, did much more of this for Hagar, than did Hagar for Whitmore. Each seems to have often aided the other with advice, and indorsements and like services without thought of other compensation than gratitude and reciprocation. We do not find sufficient evidence that Whitmore asked for money compensation, or expected it, before this trouble arose. While the indorsement of the note of another may be sufficient consideration for a promise to pay therefor, if such promise is in fact made, we do not think the mere indorsement of a friend's note, at his request, raises a presumption of such a promise. Many such indorsements would not raise such a presumption especially where the favor is often reciprocated. Whitmore does not appear to have made any charge, or expected any pay in money, for the other services alleged. Hagar paid his expenses, and there was no talk at the time of any pay for services. We

do not think any of the claims for services alleged in the cross-bill are sustained.

There is no occasion shown for the injunction asked for. The courts are open to Mr. Whitmore and his co-trustees to recover the insurance money from the recalcitrant companies. We do not see how Hagar can impede such suits. We see no merit in the cross-bill and think it should be dismissed with costs.

Returning to the original bill, it is not contended that Hagar did pay his indebtedness to the banks within the time named, or that he performed generally the conditions of the agreement. It is conceded that the defendants rightfully took possession of the ships, and assumed their management. They on the other hand do not claim a forfeiture, but concede that Hagar should receive any surplus after the purposes of the trust are fully accomplished, and its affairs fully settled. It must not be forgotten, however, that the defendants were primarily trustees for the creditor banks. The conveyance of the ships was made to secure the banks. It was accepted for that purpose. The defendants owed duties to the banks as well as to Hagar. They were to care for the banks, though Hagar might suffer thereby.

It is also conceded, that after taking possession of the ships, the defendants, or at least Whitmore, did receive large sums of money from their earnings, general average accounts, insurance adjustments, and the final sale of the ships and stores, and also made large disbursements on their account, besides sums paid on Hagar's indebtedness. It also appears that the defendants or Whitmore, had not at the date of the bill fully settled the affairs of the trust and had not rendered a full account, and not paid to Hagar any balance.

The first question under the original bill would seem to be whether this delay in settling accounts, etc., was the fault of the defendants. They insist that they were pushing matters in that direction as fast as possible, and did render accounts as often and complete as practicable, and that the incompleteness and delay, if any, was owing to Hagar's interference with the insurance, &c., as alleged in the answer. We find in the case, among Hagar's exhibits, what purports to be an account of the ships and the

trust down to July 1, 1887, and which Whitmore testifies he rendered to Hagar. These accounts bring the matter down to only a little over three weeks before the suit. The Hagarstown was sold late in April. The Yorktown was reconveyed late in June. The defendants seem from the evidence to have been hindered somewhat by the obstructive conduct of Mr. Hagar as alleged. The delay in adjusting insurance and taxes seems to be on his account and at his request. We cannot say that the defendants were in fault in not having closed the trust and rendered a final account before the date of the bill July 25, 1887.

The next question under the bill is, whether the defendants were negligent and unskillful in the sale of the Hagarstown, to such a degree as to make them liable for loss. The ship having arrived at Shanghai dismasted and in a more or less dilapitated condition, from an encounter with a monsoon in the China seas, the trustees, (the defendants) sent out an agent of their own to supersede the master, and take charge of the vessel. They finally ordered her to be sold as she was, instead of attempting to repair her and bring her to the United States. The complainant does not allege fraud, but insists that the ship could have been easily repaired sufficiently to bring her home, and that to sell her in China under the circumstances, was a reckless sacrifice of his property.

Upon this point we are asked to determine, not a question of maritime law with which we might be supposed to have some acquaintance, but a question of expediency in managing a business of which we can have little or no knowledge. It is true that when a court is convinced that acts of trustees are unskillful or negligent, and occasion loss, it will relieve the *cestuis que trustent* at the expense of the trustees. The transaction here challenged, however, was upon the other side of the world in a Chinese port. The matters to be considered, in determining how to meet the emergency, were such as only persons of experience in building ships, and sailing them on for foreign voyages, could understand. No amount of mere theoretical learning would make one a safe judge of the expediency of any course. When persons, apparently of experience and practical knowledge, have

chosen a particular mode of dealing with the emergency, and the court is asked to consider such mode and award damages for the choosing it, the court may be obliged to review the transaction, but it will properly require clear and convincing evidence of its folly before so declaring.

In this case the evidence upon this question is voluminous, coming from ship masters, ship builders, ship carpenters, ship owners, seamen, etc., and affecting the model, material, and construction of the ship, the skill and experience of the defendants' agent sent to Shanghai, the experience and skill of Whitmore, the markets and customs at Shanghai, etc. The evidence is very conflicting on all these points as well as upon the general question of expediency. We have dutifully read and compared all this evidence. There is not enough in the uncontested or proven facts to make it apparent to the non-expert at this distance, that the sale at Shanghai was inexpedient. We do not think, therefore, we can safely declare that the sale of the Hagarstown was so unskillful and negligent, as to subject the trustees to damages therefor.

These findings dispose of the allegations in the bill and, perhaps, strictly of the case itself; but we may notice some other matters pressed upon us at the argument.

The complainant earnestly contends that there should be a decree against the defendants on the ground that they over insured the ships, subjecting the funds to great and needless expense for premiums; also on the ground that they did not sufficiently guard the trust estate against taxes; also on the ground that they oppressively insisted on burdensome conditions for the reconveyance of the Yorktown.

These questions were nowhere raised in any of the pleadings, and the respondents objected to much of the evidence concerning them, and insisted at the argument that they could not properly be determined in this suit. While in equity procedure all (except dilatory) pleadings are construed liberally in furtherance of the cause, yet propositions of fact, relied upon as grounds for equitable relief, must be alleged with some degree of distinctness in the bill. Claims and defenses in equity based on

facts, must be stated in bill, answer, or plea. It is not enough that they appear in the evidence, and are noticed in the argument. The maxim *probata secundum allegata* applies in equity as well as at law. If the evidence first discloses fresh grounds for relief, or defense, the party desiring to avail himself of them, should state them in some amendment or supplemental pleading, which upon proper terms he can always obtain leave to file. The decree must follow the allegations. If a party, after the evidence is taken, submits his cause upon his original allegations, he should be content with an adjudication confined to those allegations. In this cause the complainant submitted no amendments but only his original bill as first drawn. We think he cannot require us to go beyond it.

We may say, however, that we have taken the time and pains to study the evidence on these matters now suggested, and are not satisfied that, upon either ground, the defendants violated any legal or equitable rights of the plaintiff. Hagar neglected to insure the ships and thereby left the insurance to the discretion of the defendants. As we have before said, they were not merely trustees for Hagar, but primarily for his creditors. It was their duty to the creditors to keep the ships amply insured, so that making all allowances for the various deductions and expenses in marine insurance, there would be a clear surplus to pay all claims in full with interest. The evidence shows that Hagar was aware of the amount of insurance. He could have avoided the expense of it by paying his debts and retaking his property, or by selling these same ships.

In the matter of taxes, each trustee was assessed as owner of one-third of the ships, such appearing to be the title upon the record. Hagar claims that the trustees should have caused the ships to be taxed to him, as the real owner. It does not appear that the trustees were at all active in procuring the tax to be assessed against them, or that Hagar made any move toward procuring the assessment he desired. He was in possession of the ships for the taxing years 1885 and 1886, receiving their earnings, and should himself have attended to the assessment and payment of the taxes. Had he done so, had he done his duty, there

would have been no difficulty. He, however, neglected the taxes and left them to be assessed against the trustees personally. Theobald and Libby procured an abatement from the Richmond assessors. Whitmore contested the matter with the Bath authorities and was worsted. We do not see what equitable reason Hagar has to complain, when he should in equity have relieved the trustees of all this trouble by paying the taxes himself. The taxes of 1887 were scarcely due when this suit was commenced, and Hagar can adjust them himself. While he is entitled to be credited with any abatement, we think he has no ground for further equitable relief on the score of taxes. He did not do equity.

The defendants were clearly under no legal or equitable obligation to reconvey the Yorktown until all the debts, for which it was pledged, were paid in full. There is nothing inequitable, in the legal sense of the term, in trustees for creditors refusing to release any part of their security until all the secured debts are paid in full. In this case the trustees did not insist upon anything more, and, indeed, they did reconvey for less.

The plaintiff again contends in argument that the writing of January 6, 1885, does not express the real contract of the parties but was extorted from him in his extremity. He does not in his bill make any such allegation, nor pray for the cancellation or reformation of the writing. He on the contrary sets it out as the basis of his claim. It is clear he cannot be heard against it in this proceeding.

Mr. Hagar, in his testimony and in the argument, seems to make a general complaint that he has been hardly used by these defendants, especially by Whitmore; that they have unduly pushed and embarrassed him,—that they would not take such course with the property as he thought best for his interests,—that they were thinking more about making the money for the creditors than about the consequences to him. It seems that Mr. Hagar was financially embarrassed and was struggling to obtain relief. It may be that his general complaint above stated is well founded. We have no occasion to say whether it is or not, for such complaints are not cognizable by the courts until some legal or equitable

right is invaded. Rigorous creditors and struggling debtors are common spectacles. Forfeited securities are daily sold at a sacrifice by creditors, mindful only of themselves and unmindful of the debtor's loss. Summary attachments, breaking up a debtor's business and destroying his credit, are of frequent occurrence. As moralists, we may deprecate the rigor; but as jurists, we must recognize the right of the creditor to recover his own.

We might, perhaps, in strictness dismiss this bill for the reasons heretofore stated, but we think it desirable to retain the bill, as we may do, in order to effectuate an accounting and adjustment between the parties. Such accounting should be of all matters up to the date of taking the account, including items since the date of the bill. The master in taking the account and making his report, will be guided by this opinion, a copy of which should be sent to him with the order of reference. All matters determined here the master will regard as determined and not allow them to be re-opened.

The defendants claim in their answer compensation for services as trustees, in addition to their disbursements, and we may properly determine this claim here, as all the evidence is before us, and to do so will relieve the master or the justice settling the final decree, from that question. It is now the well settled American doctrine, that courts of equity may allow trustees compensation out of the estate, though none is provided for in the instrument creating the trust. In this case, from July 7, 1886, to the filing of the bill, July 27, 1887, the trustees had the care of the ships, their insurance, etc. The wreck of the Hagarstown called for extra labor, and anxiety for two or three months. There was much correspondence, telegraphing, and general managing, consuming not only time, but also nervous and mental energy. The amount involved was large, and the responsibility considerable. The work was done almost wholly by Whitmore, the other trustees being passive, but of course sharing the responsibility. We think Whitmore should be allowed $1200, and each of the other trustees $250, making a total of $1700 for compensation.

As it is impossible for the law court to determine in advance

all the questions that may arise, the matter of costs must be left till the coming in of the master's report.

> *Decrees to be made, sustaining original bill and sending the case to a master to state the account in accordance with this opinion and dismissing the cross-bill with costs.*

PETERS, C. J., WALTON, VIRGIN, FOSTER and HASKELL, JJ., concurred.